[Civ. No. 7024. Third Dist. Sept. 16, 1944.]

F. S. SHRIVER, Respondent, v. MANUEL SILVA et al., Appellants.

[Civ. No. 7025. Third Dist. Sept. 16, 1944.]

BILLY BESS COMBS, a Minor, etc., Respondent, v. MANUEL SILVA et al., Appellants.

F. M. Ostrander, C. A. Pinkham and Chester O. Hansen for Appellants.

C. Ray Robinson, Dean S. Lesher and Loraine B. Rogers for Respondents.

ADAMS, P. J.—The above entitled actions, which were consolidated for trial, were brought to recover damages sus-

tained by plaintiffs as the result of the collision of a Ford sedan in which plaintiffs were passengers, with the rear of a parked tank truck and trailer belonging to defendant Hunt and driven by defendant Silva as an employee of Hunt, plaintiffs contending that the accident was the direct and proximate result of the carelessness and negligence of defendants in that the truck and trailer were parked without lights and upon a portion of the street where they had no right to be. In each case the jury returned a verdict in favor of the plaintiff, and from the judgments entered thereon defendants have appealed, contending that the evidence is insufficient to support a finding of actionable negligence on the part of defendants, that plaintiffs' counsel was guilty of prejudicial misconduct, that the jury was misdirected on the issue of special damages, and that the awards are excessive as matter of law.

The accident occurred about 12:40 o'clock on the 31st day of October, 1942, on 16th Street between H and I Streets in the city of Merced. At the point of the accident 16th Street runs approximately north and south and forms a part of U. S. Highway 99. On the left or east side of the highway there were residences and business places; on the right or west side was a vacant lot. Between the main traveled portion of the highway and the front line of the vacant lot on the west side was a shallow water drain consisting of two parallel concrete strips, each two feet wide, there being a slight depression along the line of jointure of the two strips. On the left or east side of the street was a regulation curb, but on the west side there was no regulation curb at the place where the accident occurred. However, at the north and south ends of the block on that side there were curbs, the line of which, if projected along the street, would have coincided with the line of junction of the drain and the front line of the vacant lot.

Defendant Silva, called by plaintiffs under section 2055 of the Code of Civil Procedure, testified that he had left Pittsburg about 1:00 o'clock on the afternoon of October 30th with the tank truck and trailer loaded with acid consigned to Los Angeles; that on reaching Merced between 10:00 and 10:30 o'clock that evening he decided to take a nap, so parked the truck and trailer on the right-hand or west side of 16th Street between H and I Streets, a little south of the center of the block; that before going to sleep he did not get out of the cab

to ascertain the position of the wheels of the truck and trailer with relation to the west edge of the highway, but that he ascertained where the wheels were by looking in the rear view mirror, and that when he parked he put on the clearance lights. The truck and trailer together had an overall length of 58 feet, a width of 8 feet.

The Ford sedan in which plaintiffs were riding, and which collided with the truck and trailer, was also southward bound. It was driven by Tom Combs, and seated with him on the front seat were one Sandifur and plaintiff Shriver. Mrs. Tom Combs and her granddaughter, the minor plaintiff, a child three years of age, were in the rear seat of the sedan. Accompanying this party was another car driven by Virgil Combs, son of Tom Combs and father of plaintiff Combs, with whom were riding his wife and their small son. Shortly before the accident both of the Combs cars had stopped at a cafe in Merced about two or two and one-half blocks from the scene of the accident. After having some refreshments there the parties left the cafe, the Ford sedan being some little distance behind the other car; and as the sedan was proceeding along 16th Street it collided headon with the left rear portion of the parked truck and trailer belonging to the defendant Hunt. The accident resulted in severe injuries to plaintiffs Shriver and Combs, for which awards of $8,000 and $4,000, respectively, were made by the jury.

Plaintiffs contended, and the jury apparently found, that at the time of the collision the truck and trailer, which had a body width in excess of 80 inches, were parked at night within a business or residence district, with the right-hand wheels more than 18 inches from the right-hand curb, and were unlighted, in violation of sections 625 and 627 of the Vehicle Code. Appellants contend that the evidence is insufficient to show that the truck and trailer were so parked; that, on the contrary, it shows that the vehicles were lighted and that the right-hand wheels were within 18 inches of the right-hand curb.

As is too often the case in matters on appeal, appellants in their briefs recite testimony tending to support their own contentions, disregarding testimony to the contrary, thus ignoring the elementary rule that in passing upon the merits of an appeal an appellate court must accept as true all evidence

tending to establish the correctness of a finding or verdict and must consider the evidence in the aspect most favorable to the prevailing party, giving that party the benefit of every inference that can reasonably be drawn in support of his claim. (*Whitechat* v. *Guyette,* 19 Cal.2d 428, 436 [122 P.2d 47].)

We are concerned then, not with evidence favorable to defendants from which the jury might have found that there was no negligence on their part, but with the question whether there is in the record evidence which, together with reasonable inferences therefrom, is sufficient to support the verdict of the jury. That the accident occurred in a business or residence district is not denied. As to whether Hunt's equipment was parked with its right-hand wheels within 18 inches of the right-hand curb, and whether, at the time of the collision, it displayed lights, the evidence is conflicting. However, there is, we think, sufficient evidence to show that it was unlighted and that its right-hand wheels were more than 18 inches from the right-hand curb. Theodore C. Maines, a witness produced by defendants, who passed the parked truck and trailer both before and after the accident said that there were no lights on them after the collision, and that they were parked with the right-hand wheels 18 inches to two feet west of the east edge of the first concrete strip. There is some controversy as to whether these concrete strips did or did not constitute the curb, but the jury visited the scene of the accident, and apparently concluded that same constituted a part of the street, and that the curb line was the line of junction of the vacant lot and the concrete strips. Virgil Combs testified that he and his wife visited the scene of the accident after daylight and that all of the wheels of the truck and trailer were then on the pavement, but that at the rear of the trailer there were tire marks extending to the left from the rear wheels, indicating that the trailer had been "scooted over" to the right. This testimony was corroborated by Mrs. Combs.

That the truck and trailer were unlighted at the time of the collision was testified to by Shriver and by Tom Combs. Edward Hamilton, Merced police officer, who was called to the scene of the accident, also stated that there were no lights on the truck and trailer when he reached them, and, finally, we note that though defendant Silva first testified that his lights were on when he parked, he later testified that when he was awakened by the jolt at the time of the collision his lights

were not on, and that he then pulled the switch and turned them on; also that he then put out flares.

■ Appellants further contend that regardless of the conduct of defendant Silva, the proximate cause of the accident must be ascribed solely to the conduct of Tom Combs, the driver of the Ford car; that Combs testified that because of a slight elevation and a curve in the highway ahead of him, oncoming cars threw their lights in his face so that he could not see; and they argue that he was negligent as matter of law in not stopping his car. However, Combs testified that though the oncoming lights did interfere he could see ahead at least 50 feet and that had the truck and trailer been lighted he could have seen them; that he was going "fairly slow," that he was looking down at the road ahead of him and that he could see the white line in the center of the roadway. Respondent Shriver, who was seated on the front seat with Combs, also testified that he would have seen the equipment had it been lighted. In view of this testimony we cannot say as matter of law that Combs was negligent; and the jury has found contrary to appellants' contentions.

■ The second ground for reversal relied upon by appellants is that plaintiffs' counsel was guilty of prejudicial misconduct during the examination of the jurors when the following questions were asked and answers given:

"MR. LESHER: Q. I will ask if any of you jurors or your husbands or wives, depending upon which sex you are, own any stocks in any insurance company that insures the owners of trucks against liability? By your failure to answer or your failure to raise your right hands, I will assume that the answer is that you do not.

"Q. Have any of you any relatives that own stocks in any such company?

"Q. Have any of you ever worked for such insurance company that insures the owners of trucks against liability? A. JUROR [Mrs. Lane]: My husband has. . . . .

"Q. What concern was that? A. The Home of New York at San Francisco.

"Q. At their San Francisco office? A. Yes.

"Q. How long ago was that? A. Six years ago.

"Q. Six years ago. How long did you work there? A. My husband worked there.

"Q. Oh, your husband worked there; was he a salesman? A. He was special agent.

"Q. By special agent you mean he represented the home office? A. Yes.

"Q. He was not a salesman then? A. No.

"Q. How long was he special agent? A. About five or six years.

"Q. Had he worked for any such concern prior to that time? A. No.

"Q. Has he worked for any such concern since that time? A. No.

"Q. Why did he leave there? I don't mean to—— A. He went into business for himself, insurance business.

"Q. Insurance business for himself? A. Yes.

"Q. Is he still in that business? A. No, he isn't.

"Q. How long did he stay in that business? A. Two years.

"Q. Where? A. Chico. . . .

"By MR. LESHER: Q. Mrs. Montgomery, you tell us that you worked in an insurance office a number of years, eight or nine years ago?

"MRS. MONTGOMERY: Yes.

"Q. Where was that? A. That was what the judge referred to the other day. Fluetsch and Shaffer.

"Q. That was as general insurance agent? A. Yes; my husband sells insurance. . . .

"Q. Mrs. Lane, do you feel that your experiences or your husband's experiences in this insurance office as special agent for the company and later in his own office would prejudice you in any way in a case like this?"

At this point Mr. Ostrander, counsel for appellants, stated:

"Your Honor, I object to that and ask that it be assigned as prejudicial misconduct and ask at this time for a mistrial. No insurance company is involved in this case."

The court sustained the objection to the question and instructed the jury to disregard it. Thereafter, during examination by Mr. Ostrander, another juror stated that at one time he had been "kind of an insurance agent," but did not make a success of it and quit. Thereupon the court instructed as to who were the parties to the action, stating that the jurors were not permitted to take into consideration any parties other than those who were actually parties thereto. Mr. Ostrander then advised the juror:

"You understand as a juror that the attorneys are permitted to ask certain questions to determine the frame of mind of the juror if they can. It is their idea to find a juror that is not prejudiced either way and one who will take the evidence from the witnesses and the law from the Court and then render his own opinion. Among other questions permitted to be asked of jurors to determine the frame of mind was whether they were interested financially or any member of their family interested financially in any insurance company writing public liability. You don't take it that because that question was asked that there is any insurance involved in the case?"

The juror answered in the negative, whereupon Mr. Ostrander continued:

"Q. In other words, those questions are asked merely for the purpose of determining the frame of mind of the juror and the Court will instruct you that you are not to infer because of the fact that any question that has been asked that there is any insurance company involved at all in the action. It is an action between Mr. Shriver and the little girl, Billy Bess Combs, and Manuel Silva and V. P. Hunt and you will so consider it? A. Yes.

"MR. OSTRANDER: I pass the juror for cause. Will you ask the entire panel that question, Your Honor?

"THE COURT: Is there any member of the panel that infers from any questions asked that there is any insurance company involved in the action? I take it that none of you do."

At the conclusion of the trial the court further instructed the jury:

"In the examination of the prospective jurors for services in the trial of this case questions were asked by counsel to learn whether any juror had any interest or interests in a casualty insurance company. That was done solely for the purpose of discovering if any of you had a biased or adverse viewpoint. You are reminded and instructed that no insurance company is a party to this action and whether any party is insured has no bearing whatever on any issue in this case. Therefore, the oath you took as jurors requires that you refrain from any inference or speculations or having any discussion about whether or not this party or that party was insured. If such discussion should have caused such juror

to render a verdict as such juror would not otherwise render or which such juror believes not justified by the evidence and the law then that juror is violating his or her oath as a juror.''

From the foregoing it seems apparent that if the conduct of plaintiffs' counsel exceeded the bounds of discretion, no miscarriage of justice could have resulted, since the jurors were advised by counsel for appellants, and by the trial court, that no insurance company was involved. Appellants cite only *Robinson* v. *Wada*, 10 Cal.App.2d 5 [51 P.2d 171], but we do not consider the record in that case comparable to the one before us. There the court said, as has been said in numerous other cases, that, in order to ensure a fair and impartial jury, counsel may, in good faith, ask a prospective juror whether he is interested in a particular or any insurance company, but that, as stated in *Arnold* v. *California Portland Cement Co.*, 41 Cal.App. 420 [183 P. 171], counsel must take pains to propound such question in such a manner as not unnecessarily to convey the impression that the defendant is in fact insured. If, therefore, it appears in a particular case that the interrogation was not of such a nature as to create an impression that an insurance company, and not the defendant, would be called upon to respond to such damages as the jury might assess, such interrogation cannot be said to have constituted prejudicial misconduct.

In this case it is doubtful whether the question asked by plaintiffs' counsel contained any implication that defendants were insured; but if it did such implication was negatived by the positive statement of defendants' attorney that no insurance company was involved, and the statement of the court to the same effect. These statements were apparently accepted as true by the jurors, since, when interrogated by the court, they by their silence implied that they had not inferred from any question asked that any insurance company was involved in the action. ■ Appellants further complain that plaintiffs' counsel attempted ''to drive home the existence of liability insurance'' because, on cross-examination of defendant Hunt he asked him ''Is your lawyer Mr. Pinkham here today?'' and on receiving a negative reply stated ''He was here the other days, wasn't he?'' But the record shows that Mr. Pinkham was and is one of the attorneys of record for defendants and that at the opening of the

trial Mr. Ostrander so stated and added that he was present. There is nothing to show that Mr. Pinkham was attorney for any insurance company and we fail to see how the inquiry by plaintiffs' counsel as to his presence, irrelevant as it may have been, was calculated to "drive home the existence of liability insurance." ▇ Appellants filed a motion for a new trial, based in part upon the alleged misconduct of plaintiffs' counsel, which motion was denied. The trial court must be deemed to have concluded that no prejudice was suffered by defendants by reason of the conduct of plaintiffs' attorney, and as a trial judge is in a better position than an appellate court to determine whether the verdict was due in whole or in part to the alleged misconduct, its conclusion should not be disturbed unless plainly wrong. (*Lafargue* v. *United Railroads,* 183 Cal. 720, 724 [192 P. 538] ; *Spear* v. *Leuenberger,* 44 Cal.App.2d 236, 244-245 [112 P.2d 43] ; *Brown* v. *McCuan,* 56 Cal.App.2d 35, 41 [132 P.2d 838].) Particularly is such trial court better able to determine whether the questions asked were formulated in good faith. (*Brown* v. *McCuan, supra; Hatfield* v. *Levy Bros.,* 18 Cal.2d 798, 814 [117 P.2d 841] ; *Wills* v. *J. J. Newberry Co.,* 43 Cal. App.2d 595, 608 [111 P.2d 346] ; *Burch* v. *Levy Bros. Box Co.,* 47 Cal.App.2d 104, 108 [117 P.2d 435].)

▇ Further claiming prejudicial misconduct on the part of counsel for plaintiffs, appellants assert that in his argument to the jury he reminded the jurors that the county of Merced would be entitled to a portion of any amount awarded plaintiffs for medical expenses incurred at the county hospital, and that such statement had the effect of prejudicing them as taxpayers. It seems sufficient to say that at appellants' request the court instructed the jury to disregard this argument of counsel, and it will be presumed that they did so.

▇ However, we note that counsel for appellants injected this subject into the case when, during the trial, after the hospital bills had been introduced in evidence, he evoked the following:

"[MR. OSTRANDER] : Q. Now, these bills that have been handed in here, are they going to the medical association or is there an arrangement of that sort?

"A. Those——

"MR. LESHER : I object to that as being incompetent, irrelevant and immaterial.

"THE COURT: It might be to the interests of either party; objection overruled. Answer the question.

"THE WITNESS: This doctor bill, I believe, goes to the association.

"MR. OSTRANDER: Q. The general hospital has charge of those people from whom they can't collect, isn't that correct?

"A. I don't know whether I should answer that question Your Honor.

"Q. Well, you have testified as to these bills.

"MR. LESHER: I object to that as being incompetent, irrelevant and immaterial. He has testified the bills are low enough.

"THE COURT: Objection overruled. If there is any harm it can go one way or the other. You may answer the question if you can.

"THE WITNESS: State the question, please.

"MR. OSTRANDER: Q. Your general hospital collects bills when they are collectible?

"A. As far as the business at the general hospital is concerned, I know nothing.

"Q. You know nothing about the bills that you are testifying about?

"MR. LESHER: Your Honor, he is arguing with the witness. The witness knows nothing about the bills because he doesn't have to know what happens to them.

"MR. OSTRANDER: I think we as taxpayers ought to know where the money goes.

"MR. LESHER: I tried to get counsel to stipulate that the money goes to the county that is collected.

"MR. OSTRANDER: That is all."

In 24 California Jurisprudence, section 27, page 743, it is said that in summing up the case counsel are given wide latitude; that they are at liberty to discuss the case in all its bearings, provided they do not attempt to bring in matters outside the case made. And where facts alluded to are in evidence counsel has the right in argument to refer to them. (*Aydlott* v. *Key System Transit Co.*, 104 Cal.App. 621, 628 [286 P. 456], and cases there cited.)

Appellants' third and fourth contentions, to wit, that the court misdirected the jury, and that the damage awards are excessive as matter of law, will be considered together since they are based upon the same ground—that there was

no testimony that the hospital bills introduced in evidence were reasonable.

The instructions complained of were that if verdicts were found for plaintiffs the measure of their recovery would be such sums as would compensate them for the injury sustained, and that elements of damage included the reasonable value of such services as were reasonably necessary in treating their injuries, such as doctor's services, X-rays, hospitalization, and nursing, if any. It is not argued that such instructions were incorrect in themselves, but that they should not have been given because there was no testimony that the hospital bills were reasonable. The contention as to the excessiveness of the awards is that since the damages were not segregated by the jury, but awards of lump sums were made, such awards must be deemed excessive because it is to be presumed that they include the hospital bills.

The complaint of plaintiff Shriver alleges that he "was required to and did secure hospitalization and the services of physicians and surgeons for the care and treatment" of his injuries, and that he had "become obligated to pay" the reasonable charges therefor, amounting to $919.25. The complaint of plaintiff Combs contains similar allegations, the amount of the obligations incurred for hospitalization and medical services being $247. Defendants in their answers did not deny these allegations specifically; they merely denied any damage to plaintiffs. They did not demur to plaintiffs' complaints, and no objection was interposed when, during the course of the trial, plaintiffs requested and were granted leave to amend their complaints to conform to the proof as to the amounts of the bills. Nor did they object when the bills were introduced by plaintiffs, except that, after they had been admitted, Mr. Ostrander stated: "Your Honor, we object to the admission of the bills in this case for the reason that those bills so identified are not indebtedness incurred by these people, to my knowledge." Testimony as to the various services rendered to plaintiffs at the hospital was given by two of its resident physicians. Dr. Dennis testified that plaintiff Combs was in the hospital 44 days, and plaintiff Shriver 147 days, and both he and Dr. Johnson testified regarding the extent of the injuries sustained by plaintiffs and treatments given them. This testimony shows that respondent Shriver sustained two fractures of the pelvis, a broken left jaw, and

chest injuries; that several teeth were knocked out of both upper and lower jaws on the left side, and that he is unable to open his mouth as wide as before; that his hearing on the left side has been impaired, that injury to his back has impaired his walking and his balance, and that the use of his arms has been limited since the accident; that X-rays reveal a well-defined sacroiliac separation which appears to be permanent; that the crest of the right hip was fractured; that injury to the pelvis has left a deformity that is permanent; that the fracture of the lower jaw was comminuted and that the jaw has degenerated, showing infection and inflammation, which condition is permanent.

The infant plaintiff suffered numerous contusions, bruises, cuts and abrasions and was rendered semi-conscious by the collision; she had a very definite fracture of the pelvis, and, in addition, there was a fracture of the last lumbar vertebra which was crushed and tilted upward. The injury to the pelvis has restricted the normal pelvic outlet and will impair childbirth, she has a lateral curvature of the spine, and both the pelvic deformity and curvature are permanent.

Appellants concede in their brief that plaintiffs introduced sufficient evidence to support a finding that the bills for medical services were reasonable, but assert that they failed to introduce any evidence to support a finding that the bills for hospitalization were reasonable. They cite *Linde* v. *Emmick*, 16 Cal.App.2d 676, 684 [61 P.2d 338], to the effect that unpaid bills for medical and hospital services do not prove the reasonable value of such services and are insufficient to support an award therefor. In that case we note that defendant objected to the introduction of the bills when they were offered by plaintiff, and that they were admitted over the objection; also, neither the extent of plaintiff's injuries, nor the nature of the medical and hospital services, if any, which were rendered to him, appears, while in the case before us the bills were introduced without objection, and the extent of plaintiffs' injuries is shown. Also, the bills introduced in the instant case are itemized, and show charges for X-rays, casts, anesthetics and medicines, as well as hospitalization charged at the rate of $4.00 per day for plaintiff Shriver and $2.00 per day for plaintiff Combs. It is not contended, nor was there any showing, that any of the services charged for were not necessary for the treatment of the injuries sustained by

the parties, and said charges do not appear to be unreasonable in view of the extensive injuries suffered. While, as a general proposition, the rule laid down in *Linde* v. *Emmick, supra,* that unpaid bills for medical and hospital services are insufficient to support an award therefor, is correct, its application depends to some extent upon the circumstances of each individual case. In *Townsend* v. *Keith,* 34 Cal.App. 564 [168 P. 402], plaintiff was asked what bills he had incurred on account of services rendered by physicians and for hospital services, which bills the record in the case shows had not been paid. Objection was made to this question, and overruled. The court said, at page 566:

"The expenses incurred amount to approximately two hundred dollars, i. e., one hundred and fifty dollars for physician, ten dollars for a specialist, thirty-two dollars hospital bill and thirty dollars or forty dollars for medicines. This, on its face, does not seem to be unreasonable. The reasonableness of the expenses which plaintiff had incurred was not disputed by defendant on the trial, and therefore the failure of the trial court's charge to the jury to limit its finding to the reasonable value of the expenses incurred was not an error which prejudiced the defendant. (*Melone* v. *Sierra Ry. Co.,* 151 Cal. 113, [91 P. 522].)"

In *Melone* v. *Sierra Ry. Co.,* above cited, in instructing the jury upon the measure of damages the court declared, as one of the elements of damage, such sum as would compensate plaintiff for the expense, if any, he had paid or incurred in the employment of a physician and the purchase of drugs during the time he was disabled by the injuries, not exceeding the amounts alleged in the complaint. It was objected to this instruction that the correct measure of damages in this regard was not the amount which he might have paid or become liable for, but the necessary and reasonable value of such services as might have been rendered him, that is, such reasonable sum as had been necessarily expended or incurred in treating the injury. The court said that such was the true rule, but that it did not believe that the jury could have been led into error prejudicial to the defendant by the instruction given; that "The reasonableness of the expenses which plaintiff had incurred was not disputed."

We think that appellants' objection, made for the first time

on this appeal comes too late, that the charges on their face appear to be entirely reasonable, that the jury were justified in so finding, and that appellants have not been prejudiced. ▪ A party should not be permitted to remain quiet and take the chance of a favorable verdict, and then, if it is unfavorable, raise objections for the first time on appeal. (*Aydlott* v. *Key System Transit Co., supra.*)

▪ It is finally argued by appellants that as to the charges for services rendered to the infant plaintiff, same are not recoverable in this action brought by her through her father as guardian ad litem; that parents are primarily charged with responsibility for the hospital and medical bills of their minor children, and that such expenses are not recoverable in an action prosecuted by a minor child in its own right. *Bauman* v. *San Francisco*, 42 Cal.App.2d 144 [108 P.2d 989], holds to the contrary. There the court said, at pages 162-163, after citing cases:

"From these cases the following rules can be ascertained. The parents of a minor are normally responsible for medical and hospital care furnished the minor, and the cause of action to recover these items normally rests with the parents. But the child is also liable for the reasonable value of these expenses. Moreover, where the parents bring the action as guardians ad litem, and the bills have not been paid, and these expenses are pleaded, this constitutes a waiver of the parents' rights, and at least where contributory negligence of the parents is not asserted as a defense, the child may properly recover these items. In such case the parents would be estopped from recovering these expenses on their own behalf. Applying these rules to the facts here involved it is our opinion that on the retrial the plaintiff should be permitted to recover the unpaid doctors' bills."

Also see *Finnerty* v. *Cummings*, 132 Cal.App. 48, 50 [22 P.2d 37]; *Rawlins* v. *Lory*, 44 Cal.App.2d 20, 26 [111 P.2d 973]; *Aubel* v. *Sosso*, 72 Cal.App. 57, 60 [236 P. 319].

As we find no errors justifying reversal, the judgments are affirmed.

Peek, J., and Thompson, J., concurred.